UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| WILLIAM E. ROMINE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:11-CV-282-REW |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | & ORDER |
| SAINT JOSEPH HEALTH SYSTEM | ) | |
| d/b/a SAINT JOSEPH – MT. | ) | |
| STERLING, | ) | |
| | ) | |
| Defendant. | | |

\*\*\* \*\*\* \*\*\* \*\*\*

Defendant, Saint Joseph Health System, d/b/a Saint Joseph – Mt. Sterling ("SJMS"), moved for summary judgment on all claims.[1] DE #16 (Motion). Plaintiff, William E. Romine, responded in opposition (DE #17), and SJMS subsequently replied (DE #18). Having reviewed the filings and the full record under the required standards, the Court **GRANTS** SJMS's motion and dismisses this action in its entirety.

**I.      Relevant Background**

On August 30, 2010, Romine cut his left hand between his thumb and index finger while attempting to use a pair of scissors to unstop a bottle of Gorilla Glue.[2] *See* DE #16, Attach. 1 at 8[3]; DE #17 at 2. The cut caused blood to shoot into the air. *See* DE #16, Attach. 1 at 8. When the bleeding did not stop after a few seconds, Romine walked

---

[1] SJMS's motion also requests a hearing. *See* DE #16. No hearing is necessary to resolve the summary judgment motion.

[2] The Court discusses the facts in favor of Romine, the non-movant. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); Fed. R. Civ. P. 56.

[3] Page numbers correspond to the page numbers imposed by the Court's cm/ecf electronic filing system.

1

across the road and asked his neighbor, Chuck Newkirk, to take him to the hospital. *See id.* The bleeding was so profuse, Newkirk told Romine that he thought he was carrying a handful of strawberries. *See id.*; DE #17, Attach. 6 at 3. Newkirk gave Romine a clean towel to wrap his hand and then drove him directly to SJMS, the hospital. *See* DE #16, Attach. 1 at 8; DE #17, Attach. 6 at 3. Romine estimated that the trip to the hospital took five minutes. *See* DE #16, Attach. 1 at 12.

Romine and Newkirk arrived at SJMS's emergency room, and Romine saw the receptionist and a woman he believed to be the triage nurse at the registration window. *See id.* at 8, 9. Newkirk informed the receptionist that Romine cut his hand and needed to see a doctor. *See id.* at 8. The receptionist handed Romine a form to fill out. *See id.* Romine indicated that he could not fill out the form because he was using his right hand to hold the towel over his injured hand. *See id.* The towel was "pretty saturated" with blood. *See* DE #17, Attach. 6 at 4. The receptionist suggested that Newkirk fill out the form for him. *See* DE #16, Attach. 1 at 8. Newkirk took the form, and Romine asked him to call his stepson, Wendell Fraley. *See id.* Romine gave Newkirk Fraley's number, and Newkirk walked outside. *See id.*

The receptionist handed Romine another form. *See id.* Again, Romine told her that he could not fill it out, and he stated, "I'd just like to see how bad my hand is hurt." *See id.* The receptionist advised him that no beds were available. *See id.* Romine stated that he did not need a bed, he just needed someone to look at his hand. *See id.* at 9. The nurse repeated that no beds were available, and he would have to wait. *See id.* After another similar exchange, Romine noted that if his injury was serious enough, he would go to the hospital in Winchester. *See id.* Within minutes, Romine left the SJMS ER,

2

noting that he was going to Winchester.  *See id.*  According to Romine, the presumed triage nurse said nothing throughout his exchange with the receptionist.  *See id.* at 12.  Romine stated that he was in the ER approximately ten to twelve minutes on this first visit.  *See id.* at 9.

Romine asked Newkirk to take him home so Fraley could drive him to Winchester.  *See id.* at 10.  Newkirk waited with Romine for five to ten minutes until Fraley arrived.  *See id.* at 10.  Fraley asked to see the cut, and the blood was pooling beneath Romine's skin, so they thought it might be getting better.  *See id.*  Romine held the towel back over the injury.  *See id.*  A few minutes later, Fraley asked to see the cut again.  *See id.*  This time, when Romine raised the towel, blood "squirted" into Fraley's face.  *See id.*; DE #17, Attach. 7 at 3.  Fraley then announced that he was taking Romine back to the hospital.  *See* DE #16, Attach. 1 at 10.  Romine asked Fraley to take him to the hospital in Winchester.  *See id.*  Because Fraley believed the injury involved an artery and was too serious, however, he told Romine he would take him back to SJMS, the closer hospital.  *See id.*; DE #17, Attach. 7 at 5.

Upon his return to the SJMS ER, Romine saw the same receptionist and the same nurse at the registration window.  *See* DE #16, Attach. 1 at 10.  Fraley informed the receptionist that Romine had a bad cut on his hand and needed to see a doctor.  *See id.*  The receptionist told Fraley that there were not any beds available.  *See id.*  Fraley informed the receptionist that if Romine took the towel off his hand, blood would "squirt all over the place."  *See id.*  The receptionist stated that he would still have to wait.  *See id.*  The two men waited for a few minutes.  *See id.*  Romine then went over to the

receptionist himself and told her that he was bleeding very badly. *See id.* Again, she stated that he would have to wait. *See id.*

After a few more minutes, a second nurse came to the window to take another patient back for treatment. *See id.* She saw Romine with the bloody towel, and she asked him why he was there. *See id.* at 11. They told her about the cut. *See id.* The nurse then removed the towel and blood spurted from Romine's wound. *See id.* She immediately took Romine back into the ER for treatment. *See id.* A third nurse was able to stop the bleeding temporarily. *See id.* It was determined that SJMS was unable to treat Romine's injury, *see* DE #1, Attach. 1 (Complaint at ¶ 7), and a decision was made to airlift Romine to the hospital at the University of Kentucky. *See* DE #16, Attach. 1 at 11. Within five minutes of arrival in Lexington, the physicians at UK had the bleeding stopped with three stitches closing the wound. *See id.* at 15. In the early morning hours of August 31, 2010, a hand surgeon examined Romine's hand and replaced the initial stitches placed primarily to stop the bleeding with normal sutures. *See id.* Romine left UK's hospital at approximately 5:00 a.m. on the thirty-first. *See id.* at 16.

Romine received follow-up care from an orthopedic specialist at the Lexington Clinic one to two weeks following the injury. *See id.* The Lexington Clinic physician removed the stitches and told him not to use his hand for another two weeks. *See id.*

On August 23, 2011, Romine filed suit against SJMS in Montgomery Circuit Court. *See* DE #1, Attach. 1. In his Complaint, Romine alleges that SJMS violated the Emergency Medical Treatment and Active Labor Act (EMTALA) by failing to provide him with an appropriate medical screening and by failing to stabilize his injury. *See id.* Romine alleges that he suffered an aggravation of the injury for which he originally

sought treatment as a result.[4] *See id.* Following the close of discovery, SJMS filed the summary judgment motion currently before the Court.

## II. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553

---

[4]The first two counts of Romine's Complaint *could* be construed as alleging that SJMS is liable for the aggravation of Plaintiff's injury under a state law theory of negligence. *See* DE #1, Attach. 1 (Complaint at ¶¶ 11-21). In its responses to SJMS's first requests for admission, however, Romine admitted that he was not asserting a claim that the care and treatment provided to him by SJMS on August 30, 2010, constituted professional malpractice or negligence. *See* DE #16, Attach. 2. Further, the parties' summary judgment pleadings speak only in terms of EMTALA. *See* DE ##16, 17, 18. Indeed, in Romine's Response to SJMS's Motion for Summary Judgment, he states, "This case comes before the Court on the Plaintiff's Complaint under the Emergency Medical Treatment Act and Active Labor Act . . . . To establish an EMTALA violation, the patient need not establish any standard deviation of care . . . ." DE #17 at 1. Accordingly, the Court considers all of Romine's claims to be EMTALA claims. Even if Romine did allege a claim of negligence, the claim must fail due to lack of evidence that any action on behalf of SJMS caused the aggravation of his injury, as discussed more fully below. *See also Andrew v. Begley*, 203 SW.3d 165 (Ky. App. 2006) (expert proof generally required in medical negligence cases to establish the standard of care and to establish that the alleged negligence proximately caused the injury).

(1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106 S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999).  However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* at 106 S. Ct. at 2552.

A fact is "material" if the underlying substantive law identifies the fact as an essential element. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted).  Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp. v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

**III.   Analysis**

EMTALA "places obligations of screening and stabilization upon hospitals and emergency rooms that receive patients suffering from an 'emergency medical condition.'" *Smith v. Botsford General Hosp.*, 419 F.3d 513, 515 (6th Cir. 2005) (quoting *Roberts v. Galen of Virginia, Inc.*, 119 S. Ct. 685 (1999)). EMTALA's screening provision requires hospitals to provide every individual presenting to the emergency department for examination or treatment an "appropriate medical screening" to determine whether an emergency medical condition exists. 42 U.S.C. 1395dd(a). EMTALA's stabilization provision requires hospitals to stabilize patients determined to have an emergency medical condition.[5] 42 U.S.C. § 1395dd(b). The Act permits "[a]ny individual who suffers personal harm as a direct result" of an EMTALA violation to sue the offending hospital and "obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate." 42 U.S.C. § 1395dd(d)(2)(A).

SJMS argues that Romine cannot prevail on his EMTALA claims without expert proof. In particular, SJMS argues that Romine needs expert testimony to support a claim that he suffered personal harm as a direct result of an EMTALA violation. *See* DE #18 at 1-2; *see also* 42 U.S.C. § 1395dd(d)(2)(A). Romine does not dispute that he has no expert witness, nor does he dispute that the time for making his expert disclosures expired on March 15, 2012 (*see* DE #8).

The Court agrees that expert testimony is necessary. Assuming SJMS violated the screening and/or stabilization requirements of EMTALA through its conduct on

---

[5]The Act defines the term "emergency medical condition" for its purposes at 42 U.S.C. § 1395dd(e)(1).

7

August 30, 2010, Romine still must establish a causal link or nexus between the violation and his injury. *See Morin v. Eastern Maine Medical Center*, 779 F. Supp. 2d 166, 189 (D. Me. 2011); *Parker v. Central Kansas Medical Center*, 57 Fed. App'x 401, 406 (10th Cir. 2003). There may be some obvious cases in which a jury can apply its own common sense and experience and find this link. *See Morin*, 779 F. Supp. 2d at 189. Here, however, Romine alleges that SJMS's violations of EMTALA caused him to suffer an aggravation of the injury for which he sought treatment. This is not a claim the jury can evaluate using only its general knowledge and experience, especially since, although Romine testified at his deposition that he has experienced some numbness in his left arm since the injury, he also testified that no one has told him the numbness occurred because of any delay in treatment after he arrived at SJMS's emergency department. *See* DE #16, Attach. 1 at 18. He further testified that no one has told him he missed additional time at work because of any delay in treatment. *See id.* Romine is on no restrictions. Without an expert to establish a causal link or nexus between an EMTALA violation and Romine's alleged personal harm, the Court must grant summary judgment in favor of the hospital.[6]

---

[6] Under Kentucky law, a medical malpractice plaintiff generally must offer expert proof to establish that malpractice proximately caused damage. *See Andrew v. Begley*. 203 S.W.3d 165 (Ky. App. 2006); *Vance By and Through Hammons v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996); *Jarboe v. Harting*, 397 S.W.2d 775, 778 (Ky. 1965). Here, any association between the minor delay and injury aggravation calls for specialized knowledge and understand of medicine and injury mechanics, something the record does not contain. This is Plaintiff's burden, and he fails to establish a triable issue.

Plaintiff does not argue that delay *alone* is a recoverable form of harm. Indeed, no authority cited suggests that the temporal component of a screening theory, in isolation, yields "personal harm." The Court notes that under Kentucky law, the applicable damage jurisdiction, a malpractice plaintiff must establish injury, something delay in treatment does not independently create. *See Wayne County Hosp., Inc. v. Hardwick*, No. 2006-

8

Romine argues that he does not need an expert witness to establish an EMTALA violation because the Centers for Medicare and Medicaid Services ("CMS") already determined that a violation occurred. Romine points to CMS's preliminary determination letter to SJMS, indicating that CMS planned to terminate SJMS's participation in the Medicare program due to the hospital's failure to ensure that an appropriate medical screening and triage were provided for Romine in accordance with 42 C.F.R. § 489.24 and/or 42 C.F.R. § 489.20. *See* DE #17, Attach. 4.

SJMS, however, avoided the termination action by submitting a Plan of Correction ("POC") CMS found satisfactory. *See* DE #17, Attachs. 4 and 5. In its POC and responsive materials, SJMS specifically stated that it was not conceding that the cited conduct constituted a violation of EMTALA. *See* DE #17, Attach. 5 at 2. The Court must give an administrative agency's decision preclusive effect only "when an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an opportunity to litigate." *Crow v. City of Springfield*, 15 F. App'x 219, 222 (6th Cir. 2001); *see also Astoria Federal Sav. And Loan Ass'n v. Solimino*, 111 S. Ct. 2166, 2169 (1991); *United States v. Utah Construction and Mining Co.*, 86 S. Ct. 1545, 1560 (1966). Here, it is clear that SJMS did not litigate the facts. Indeed, the notification evidently is the first step in a CMS decision to

---

CA-000505-MR, 2007 WL 625283, at *1 (Ky. App. Mar. 2, 2007) (considering whether there was a reasonable basis for the jury to determine that a negligent, one-year delay in diagnosis was a substantial factor in *causing the plaintiff harm*). Finally, the structure of the EMTALA remedy means, by definition, that a hospital could provide a screening that is not appropriate and yet not face a civil liability because the screening did not directly result in personal harm to the patient.

terminate a hospital from Medicare participation.[7]  CMS labeled the notification a "preliminary determination letter."  DE #17, Attach. 4 at 2.  SJMS's response satisfied the agency before any formal enforcement mechanism, which might have involved an adjudicative component, occurred.[8]  Thus, CMS's decision is not binding.  Moreover, even if CMS's decision were binding, Romine still would not be able to establish a link between the EMTALA violation and his personal harm without expert proof, as discussed above.

Alternatively, even if Romine had expert testimony establishing that conduct on the part of SJMS aggravated his hand injury, he could not prevail on an EMTALA screening claim because he cannot show that SJMS acted with an improper motive.  In *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir. 1990), the Sixth

---

[7] CMS found that SJMS violated 42 U.S.C. § 489.24, and CMS planned to terminate SJMS's participation in Medicare pursuant to the provisions of 42 C.F.R. § 489.53.  *See* DE #17, Attach. 4.  The preliminary determination letter filed in the record in this case (*see id.*) presumably constituted the first step in the termination process, as it provided SJMS with "preliminary notice" that its provider agreement would be terminated in twenty-three days *if* SJMS failed to correct the identified deficiencies or refute the finding of a violation.  *See* 42 C.F.R. § 489.53(d)(2)(i)(A). Had the termination proceeded, the next step would have been for CMS to give SJMS "a final notice of termination, and concurrent notice to the public, at least 2, but not more than 4, days before the effective date of termination of the provider agreement."  42 C.F.R. § 489.53(d)(2)(i)(B).  SJMS could then have appealed the termination in accordance with Part 498 of Chapter 42 of the Code of Federal Regulations.  *See* 42 C.F.R. § 489.53(e). The administrative appeals process includes, as applicable, mechanisms for reconsideration of the adverse decision, a hearing, and a review of any hearing decision by the Departmental Appeals Board.  *See* 42 C.F.R. § 498.1, *et seq.*  Upon exhaustion of administrative remedies, judicial review is available.  *See* 42 U.S.C. § 1395cc(h)(1)(A). Thus, SJMS clearly never reached the point in the termination process when the relevant administrative agency would have acted in a judicial capacity to resolve disputed questions of fact the parties had an opportunity to litigate.

[8] The Court also notes that whether CMS views the elements of appropriate screening in a way consistent with Sixth Circuit law is unknown on this record.  Thus, if CMS does not assess for improper motive, but the Sixth Circuit requires motive proof, this would further complicate application of preclusion to this preliminary determination by the agency.

10

Circuit explained that the impetus for EMTALA "came from highly publicized incidents where hospital emergency rooms allegedly, based only on a patient's financial inadequacy, failed to provide a medical screening that would have been provided a paying patient, or transferred or discharged a patient without taking steps that would have been taken for a paying patient." The Sixth Circuit interpreted EMTALA's "vague phrase 'appropriate medical screening' to mean a screening that the hospital would have offered to any paying patient . . . ." *Id.* The court held that a hospital violates the Act when it fails to provide a medical screening due to an improper motive, such as indigence or "prejudice against the race, sex, or ethnic group of the patient; distaste for the patient's condition (*e.g.*, AIDS patients); personal dislike or antagonism between the medical personnel and the patient; disapproval of the patient's occupation; or political or cultural opposition." *Id.* at 272. A hospital that screens patients even-handedly, though imperfectly, does not contravene EMTALA, per *Cleland*.

Plaintiff argues that he does not need to show the hospital had an improper motive in order for his EMTALA claim to survive. DE #17 at 8-9. While Plaintiff is correct that the Supreme Court overruled a Sixth Circuit decision requiring a showing of improper motive for an EMTALA *stabilization* claim, the Supreme Court did not overrule *Cleland*'s holding with respect to EMTALA *medical screening* claims. *See Roberts v. Galen of Virginia, Inc.*, 119 S. Ct. 685, 686-87 (1999). Instead, the Court specifically stated, "The question of the correctness of the *Cleland* court's reading of § 1395dd(a)'s 'appropriate medical screening' requirement is not before us, and we express no opinion on it here." *Id.* at 687. Thus, *Cleland* remains the precedent in this Circuit. Indeed, since the decision in *Roberts*, courts in the Sixth Circuit generally have continued to require

11

proof of an "improper motive" for success on EMTALA medical screening claims. *See Newsome v. Mann*, 105 F. Supp. 2d 610, 611-12 (E.D. Ky. 2000); *Broughton v. St. John Health System*, 246 F. Supp. 2d 764, 769-71 (E.D. Mich. 2003); *Burd ex rel. Burd v. Lebanon HMA, Inc.*, 756 F. Supp. 2d 896, 902-04 (M.D. Tenn. 2010). If *Cleland* is wrong, the Sixth Circuit must say so. Otherwise, it controls district courts in this circuit.

Here, there is no evidence SJMS treated Romine differently from any other patient due to an improper motive. Romine himself noted that there were other individuals in the waiting area of the emergency department when he arrived. *See* DE 16, Attach. 1 at 11. Although Romine's Complaint alleges that SJMS failed to adequately screen him because he lacked health insurance, *see* DE #1, Attach 1 (Complaint at ¶ 26), Romine did in fact have health insurance at the time. *See* DE #16, Attach. 1 at 18. Romine does not point to evidence of any insurance query or knowledge by SJMS at the relevant juncture. No proof supports an insurance-based motive. Further, during his deposition, Romine testified that he knew of no reason why the receptionist or anyone at the hospital would have any personal animosity toward or bias against him.[9] *See id.* at 13. Without any facts or evidence suggesting an improper motive on the part of SJMS, the Court must grant the hospital summary judgment on Romine's EMTALA screening claim, per *Cleland*'s directives.

Additionally, although Romine cites a stabilization claim in his Complaint and discusses the stabilization requirement in his response to SJMS's summary judgment motion, he has not set forth facts that would support a finding that SJMS violated

---

[9] The facts suggest that the receptionist and nurse simply failed to appreciate the severity of Romine's injury.

EMTALA's stabilization provision. On his first trip to the emergency department, Romine waited ten to twelve minutes before leaving, and SJMS did not screen him, much less **determine** that he had an emergency medical condition, a necessary predicate to a stabilization claim. *See* 42 U.S.C. § 1395dd(b)(1); *see also Newsome v. Mann*, 105 F. Supp. 2d at 612 n. 2. The stabilization duty follows an "emergency medical condition" determination.[10] Further, Romine does not complain about his transfer to UK following his second trip to the hospital, nor does he claim that SJMS failed to make sufficient efforts to stabilize him before transfer. *See* DE #16, Attach. 1 at 15. No rational juror could find for Romine on a stabilization claim under these facts. *See Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356.

## IV.     Conclusion

Accordingly, for the reasons discussed above, the Court **ORDERS** as follows:

1.     The Court **DENIES** Defendant's request for a hearing on its summary judgment motion (DE #16);

2.     The Court **GRANTS** Defendant's motion for summary judgment (DE #16);

3.     The Court **DISMISSES** this matter **WITH PREJUDICE** and **STRIKES** it from the active docket[11];

---

[10] *See Burd*, 756 F. Supp. 2d at 906 (noting that only "actual knowledge of an emergency medical condition . . . triggers a duty to stabilize").

[11] Normally, in a removed federal question case, the Court would assess whether to remand any remaining state law claims. *See Carnegie-Mellon University v. Cohill*, 108 S. Ct. 614, 619 (1988); *id.* at 619 n. 7. However, given Plaintiff's overt abandonment of any supplemental Kentucky claims, *see* DE #16, Attach. 2 at 1 (Plaintiff's Response to Defendant's Request for Admission No. 2), the Court treats this decision as resolving the

13

4.       The Court shall enter a separate Judgment in favor of Defendant.

This the 27th day of November, 2012.



Signed By:
Robert E. Wier  REW
United States Magistrate Judge

---

entirety of Romine's suit on the merits. There simply are no persisting state claims to evaluate.